JOHN P. PHILLIPS *vs.* THE TOWN OF EAST HAVEN AND CITY OF NEW HAVEN.

By an act of the legislature the city of *N. H.* and town of *E. H.* were required at their joint expense to build and maintain a bridge over a river that was the boundary between them, the location and manner of construction to be determined by a board of commissioners, each to pay all damages for land taken on its own side for the bridge or for highways connected with it, and each to provide all nece-sary and convenient highways within its own limits to connect the bridge with existing highways; the bridge to be suitable and convenient for public travel and to be a public highway. A high embankment was necessary to make the bridge accessible, but a much longer one on the side of the city than on that of the town. Held that the bridge, as intended by the act, did not include the embankments necessary for access to it, but that each corporation was to make the embankment on its own side.

BILL IN EQUITY, praying for the appointment of commissioners to complete a bridge which by an act of the General Assembly the respondent city and town were required to build; brought to the Superior Court in New Haven County. The following facts were found by the court:

The General Assembly, at its session in 1872, passed an act, the parts of which material to the present case, are as follows:

"SEC. 1. The city of New Haven and the town of East Haven are hereby authorized and directed to build and maintain a bridge over the Quinnipiac River, suitable and convenient for the accommodation of public travel, having therein a draw not less than seventy feet in width, from some point between a point at or near the southerly end of Blatchley Avenue in the city of New Haven and a point at or near the easterly line of South Front street, one hundred feet northerly from the wharf of Alfred Thomas in said city, to some convenient point on the opposite or easterly bank of said river, in the town of East Haven, which bridge when completed shall be a public highway. The expense of building and maintaining said bridge shall be borne and paid by said city and town in equal parts. * * * *

"SEC. 2. For the purpose of aiding in carrying this act

VOL. XLIV.—4

into effect there shall be appointed a board of seven bridge commissioners.     *     *     *     *     *     *

"Sec. 3.   It shall be the duty of said commissioners to locate said bridge, and to direct in regard to the materials and manner of its construction and to superintend the same. *     *     *     *     · *     *     *     *

"Sec. 5.   If said city and town, or either of them, shall, without good and sufficient cause, neglect to begin the construction of said bridge on or before the first Monday of August, 1873, or to reasonably prosecute the same to its completion, or to lay out and construct highways as hereinafter provided, the Superior Court for New Haven County shall, upon the application of any citizen or tax-payer therein, and after reasonable notice is given to such negligent city or town, appoint not less than three competent and disinterested commissioners to build or complete said bridge and to lay out and construct said highways;     *     *     *     *

"Sec. 6.   Said city and town shall each, upon the completion of said bridge, and without unnecessary delay thereafter, cause to be laid out and constructed and opened for public travel, necessary or convenient highways, within its limits respectively, from said bridge to highways now existing, and to highways, if any, which have been laid out, but which are not yet opened for public travel."

An act passed in 1874 gave the city certain further powers with regard to the laying out of the highways required by the foregoing act.

Pursuant to the first mentioned act a board of seven bridge commissioners was duly chosen and qualified, and still hold office.   This board, in 1873, located a bridge within the limits prescribed in the act, and under their direction and superintendence a bridge has been constructed across the Quinnipiac River.   The bridge is four hundred and forty feet long, resting on five piers, each rising fifteen feet above high-water mark. The pier nearest the New Haven side of the river is on the edge of Maltby's wharf, and rises twelve feet above the same; the pier nearest the East Haven side of the river was located in the river, fifteen feet above high-water mark.

The southerly end of Blatchley Avenue is the water line of the Quinnipiac River, and the easterly line of South Front street is within one hundred feet of the river, at a point a hundred feet northerly of Thomas's wharf. The bridge, so constructed, was substantially finished on or about September 1st, 1875. The board did not construct, or take any steps to construct, nor does it propose to construct, any approaches to the bridge, but has left it inaccessible to travel for want of any highway connections with either bank of the river, because they deem their duty to extend only to the location and superintendence of the construction of the bridge proper.

The town of East Haven construed these acts as imposing upon it the duty of constructing suitable highway approaches to the bridge on the East Haven side, at its own exclusive cost, and as imposing a similar duty on the city of New Haven as respects the New Haven side; and in conformity to such construction went forward in the month of June, 1875, purchased land for approaches, and built approaches to the bridge of a suitable and convenient character. These approaches connect with the bridge by means of an embankment fifteen feet high at the point of connection above the river, and sloping down by a suitable grade for a distance of a hundred and seventy-seven feet to a highway leading to the village centre. This approach cost about $10,000, of which $9,000 has been paid by East Haven, and about $1,000 more is due from the town on the same account.

East Haven did not consult New Haven in reference to the construction of this approach, and no communication has ever passed between the town and city relative to the duty of either as respects the construction of approaches to the bridge, nor did New Haven object to the construction by East Haven of its approach.

East Haven claims that New Haven ought to go forward and construct proper approaches on the New Haven side, at the sole expense of the city, and the city is ready to do its duty in the matter, whenever the same is judicially declared, but has declined to build any approach until the matter is so determined. The necessary approaches on the New Haven side

would involve an embankment twelve feet high at the point of connection with the bridge proper, and three hundred and twenty-five feet long, at a grade of three and a half feet to the hundred feet, which is the grade adopted on the East Haven side, and a suitable one for the purpose.

The allegations in the petition respecting the petitioner's ownership of land, and the damages thereto by reason of the present inaccessibility of the bridge, and that he is a citizen and tax-payer of New Haven, are true.

The city of New Haven claims that the word "bridge," as used in the act, means the superstructure, with proper and suitable approaches connecting the · same with either bank, and the petitioner thereupon claims that, inasmuch as the board of bridge commissioners and the city and town neglect and do not propose to build these approaches, they do not reasonably prosecute the bridge to its completion with good and sufficient cause, within the meaning and intent of the act. There has been no neglect "to reasonably prosecute the construction of said bridge," or "to lay out and construct· highways" for use in connection therewith, on the part of either the town or the city, unless such neglect is disclosed by the facts above stated.

The city is willing to reimburse East Haven for half the expense of constructing the East Haven approach (exclusive of cost of land,) provided East Haven will join the city in paying for the New Haven approach (exclusive of cost of land,) and provided the same is built under the direction of the board of bridge commissioners.

Upon these facts the case was reserved for the advice of this court.

*J. P. Phillips* and *S. L. Bronson*, for the petitioner and for the City of New Haven, contended that the term "bridge," as used in the act, included the embankments on both sides necessary to make the bridge accessible; citing Wharton's Lex., *Bridge;* Angell on Highw., §§ 40, 65, 67; *Tolland* v. *Willington*, 26 Conn., 582; *Burritt* v. *City of New Haven*, 42 Conn., 174; *The King* v. *West Riding of York*, 7 East,

588, 599; *West Riding of York* v. *The King*, 5 Taunt., 284; *Freeholders of Sussex* v. *Strader*, 3 Harrison, 108; *Bardwell* v. *Town of Jamaica*, 15 Verm., 438; *Parker* v. *Boston & Maine R. R. Co.*, 3 Cush., 116.

*S. E. Baldwin*, for the Town of East Haven, contended that the embankments were not included as a part of the bridge, and that the city of New Haven was bound to make the embankment on its side of the river at its sole expense; citing *Tolland* v. *Willington*, 26 Conn., 578, and *City of New Haven* v. *N. York & N. Haven R. R. Co.*, 39 id., 128.

Loomis, J. The legislature by a special act passed in 1872, authorized and directed the City of New Haven and the Town of East Haven to build and maintain a bridge over the Quinnipiac River at their joint and equal expense; but the land damages and the expense of constructing and maintaining necessary highways to connect with the bridge within the limits of each were to be paid for by each severally. Special Acts of 1872, page 209.

The board of bridge commissioners, appointed pursuant to the act, located the bridge within the prescribed limits, and under their direction and superintendence a bridge has been constructed over said river; but the board deeming their duty to extend only to the location and construction of the bridge proper, left the same inaccessible to travel for want of highway connections with the same at either bank of the river. East Haven has however at its own expense built a suitable and convenient approach to the bridge at its east end by means of an embankment fifteen feet high at the point of connection with the bridge, and sloping down by a suitable grade for a distance of one hundred and seventy-seven feet, to a highway leading to the village centre, and claims that New Haven ought to go forward and construct, at its own expense, proper approaches on its side, which it is found would require an embankment twelve feet high at the point of connection with the bridge proper, and three hundred and twenty-five feet long, at a grade of three and a half feet to

the hundred feet, which is the grade adopted on the East Haven side and is a suitable one for the purpose. But the City of New Haven refuses to do so, claiming that the word "bridge" as used in the act means the superstructure together with proper and suitable approaches to make the bridge accessible, and that the board of bridge commissioners ought to have caused the same to be built at the joint expense of the city and town.

The question therefore is, whether the approaches above described are component parts of the bridge itself, to be built jointly, or whether they belong to the highway connections, to be built by the city and town respectively within their own limits.

The word "bridge," when used in a statute, may or may not include its approaches, according to the context and the circumstances of each case.

The case of *Tolland* v. *Willington*, 26 Conn., 578, cited in behalf of the petitioner as sustaining the proposition "that the work of a bridge under the statute requiring towns to make necessary bridges includes whatever is necessary to make it accessible," fails to sustain the claim of the petitioner in that unqualified manner; on the contrary, ELLSWORTH, J., in giving the opinion on page 582, says: "The judge has drawn an inference that Willington is jointly bound with Tolland to maintain this railing. We are not satisfied that he has therein committed an error, for it may be that this abutment is part of the bridge. We cannot say, as matter of law, how this is. We cannot decide, as matter of law, what is bridge or what is abutment—where one begins and the other ends, or what is mere highway. It is more a question of fact than of law, and may be sometimes a very nice and difficult one. If a bridge is considered to be a pathway for travelling over a stream of water, or if the work of a bridge includes whatever is necessary to make it accessible, as we think is intended by the statute respecting bridges, when it requires towns to maintain necessary bridges, the abutments may be part of a bridge. At any rate, these towns have so treated this structure, whether of earth, wood or stone, which

occupies this space of a hundred and fifty feet. At first it was all wood; it may become so again, for the stream is unchanged, except that the abutments confine it to a narower and deeper channel. The towns could well agree to fill out the work in a permanent form from the shores, if they thought it wise and best." It is quite obvious that this case was mainly controlled by the fact that the town of Willington had repeatedly and for many years recognized its joint obligation with Tolland, as covering the identical place where the injury occurred.

It is found that the space of a hundred and fifty feet occupied by the river was at first spanned by a superstructure of wood, which was afterwards carried away by a flood, and the bridge was then rebuilt by the joint action of both towns, and in rebuilding it was thought best to fill a portion of this space covered by the first bridge, solid with earth, gravel and stone, which was done, and afterwards the space was still further reduced by the towns in the same manner, until at the time in question it was only sixty-five feet, instead of a hundred and fifty feet.

In the case of *City of New Haven* v. *New York & New Haven R. R. Co.*, 39 Conn., 128, the question was as to the meaning of the word "bridge" as used in the thirty-third section of the city charter, where it is provided that the court of common council shall have supervision over all bridges crossing railroads in said city," and the court, SEYMOUR, J., giving the opinion, said: "The word 'bridge' may in certain connections be so used as to include embankments and approaches, but in this thirty-third section of the city charter we think the word is restricted to the bridge proper, to the exclusion of embankments, filling and approaches, unless indeed perhaps the immediate approaches may be included as part of the bridge proper itself."

These authorities will suffice to show that this case depends, not upon any necessary legal meaning to be given in all cases to the word "bridge," but upon the meaning of that word as it was used in the act referred to; upon the intention of the legislature as evidenced by all the words used, and not simply by one word.

On the part of the petitioner, the argument upon the construction of the act drawn from the language used, seems to be based upon the following expressions:—that the bridge to be built shall be "suitable and convenient for public travel;" that it shall be "when completed a public highway;" and that "the commissioners shall hold their office until the bridge is completed and opened for public travel;" all going to show, as the petitioner claims, that an accessible bridge, and not merely a superstructure, was contemplated.

Undoubtedly the act contemplates an accessible structure. The object was to accommodate public travel between the city and the town over this bridge. All this must be at once conceded, and yet the argument falls short of its object, because it fails to discriminate as to the means provided in the act whereby the bridge becomes or may become accessible. It assumes that it must be by the joint action or at the joint expense of the city and town, or not at all.

The act we are construing is not one prescribing a joint duty only, but a several duty in addition. The joint duty is to build a bridge over the Quinnipiac River. The several duty is that each must pay the land damages and provide connecting highways within its own limits. And it requires the fulfilment of both these duties to accomplish the object contemplated by the act, to wit, the accommodation of public travel.

Taking into view these two features of the act, and considering its whole tenor, we held that it was only the bridge proper, irrespective of its highway approaches, that was to be built at the joint expense of the town and city.

Other considerations also confirm this view. In the first place, the limits fixed by the act for the termini of the bridge seem to border too closely on the river to allow as a part of the bridge such very extended approaches as is claimed. Section first refers to the structure as "a bridge *over* the Quinnipiac River," and requires it to be built "from some point between, at or near, the southerly end of Blatchley Avenue in the city of New Haven, and some point at or near a point in the easterly line of South Front street, one hundred feet northerly of the wharf of Alfred Thomas in said city, to some

convenient point on the opposite or easterly bank of said river, in the town of East Haven." As to the terminus on the New Haven side, it is found that the southerly end of Blatchley Avenue is the water line of the Quinnipiac River, and the easterly line of South Front street is within a hundred feet of the river, at a point a hundred feet northerly of Thomas's wharf. Then as to the terminus on the East Haven side, it is " the bank of the river," not a point a hundred and seventy feet from the river. If the approaches were contemplated as a part of the bridge it could not have been located wholly within the limits prescribed.

And if these approaches were to be a part of the bridge, it is difficult to account for the prominence given in the original act, and also in another special act passed in 1874, (see Special Acts of that year, page 156,) to the duty of the towns severally to provide connecting highways with the bridge. There was no highway needed on the East Haven side, for the approach terminated in an existing highway; and in the city at the end of three hundred and twenty-five feet it would seem there could scarcely be any need of one. And yet it was so important that, after the bridge was located, and the building of it had been commenced, the duty was further enforced by the act of 1874.

Again, it seems to us that if it was contemplated that the bridge should be considered as including these overland approaches, the land damages would naturally have been included in the joint expense, as well as any part. It is said, however by the petitioner, that this provision for land damages indicates that the legislature contemplated that the bridge must be connected with the land in some way, otherwise there would have been no land damage in constructing or on account of the bridge; but the landward abutments would naturally be expected to touch the shore at some point above the water line, so as to call for land damages, and hence the act provided that it should be paid by the town within whose limits it might be occasioned. And it would seem quite significant that the same rule was prescribed in this respect as in case of

connecting highways, and that the two things are in such immediate connection in the act.

The superstructure over the river, and the landward abutments at either terminus, must be paid for jointly, but the instant the land is reached within the limits of the city or town, the rule changes, and the act imposes all such expenses on such city or town exclusively. It seems far more just and natural that these long highway approaches should be owned and controlled by the municipality that owns the land. On the part of the city what is thus expended can, under its charter and the act of 1874, be assessed as benefits on its citizens. It will also be far better to have these approaches under the same custody and control that the contiguous territory is under. Many practical inconveniences would result from a joint jurisdiction to be continued forever.

If the city could, so to speak, reach its arm over into the town, and the town into the city, the desires and wishes of each in regard to the mode and style of repairs would be likely to be thwarted. The long approach of three hundred and twenty-five feet, on the New Haven side, will doubtless soon become a city street. It would be very annoying if it could not be made homogeneous with connecting streets as to appearance and improvements. Questions as to paving, sewering, lighting, and laying side-walks, will surely arise, which the city and town authorities respectively would hardly be able to agree upon, and yet the act provides no umpire to settle such questions. The board of bridge commissioners will have become *functi officio* as soon as the bridge is completed and open to public travel.

For these reasons we accept as correct the construction of the act adopted by the bridge commissioners and the town of East Haven, and reject that urged in behalf of the petitioner and the city of New Haven, and we advise that the petition be dismissed.

In this opinion the other judges concurred.