CHARLES W. PETERSON *v.* CITY OF NORWALK ET AL.

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

Argued December 5, 1962—decided February 26, 1963

*Robert B. Seidman,* with whom was *Sidney Vogel,* for the appellants (plaintiffs).

*David S. Maclay,* with whom was *Peter Wilkinson,* for the appellee (defendant United Aircraft Corporation); with him also was *Edward J. Zamm,* for the appellee (defendant city of Norwalk).

*Thomas J. O'Sullivan,* for the appellee (defendant New York, New Haven and Hartford Railroad Company).

368

BALDWIN, C. J. The plaintiff, as a taxpayer and property owner, brought this action against the city of Norwalk. He sought a judgment declaring whether a certain contract entered into by the city with the New York, New Haven and Hartford Railroad Company and the United Aircraft Corporation was invalid. He also sought an injunction restraining the city from taking any action or making any expenditure in the performance of the contract. The railroad and the corporation intervened and were made parties defendant.[1]

The three defendants had contracted among themselves for the extension of an existing highway across the right of way of the railroad and for the construction of a bridge for that purpose. The specific questions on which the plaintiff sought a declaratory judgment are set forth in the footnote.[2] The court rendered judgment, declaring in effect that the contract was valid except as to a provision which would require the city to maintain the bridge after it was built. The plaintiff has appealed. He

---

[1] Counsel for the railroad, now in bankruptcy, subsequently obtained permission to appear in this action and in the companion case of *Peterson* v. *Norwalk*, 150 Conn. 383, 190 A.2d 41, in behalf of the trustees in bankruptcy.

[2] (1) Whether the contract is illegal and void; (2) whether the defendant city may legally agree to make payments which by statute must be made by another; (3) whether the change of zone affecting the Devine property is illegal and void; (4) whether the proposed Triangle Street extension and bridge are required by public convenience and necessity; (5) whether payments made by the defendant city, pursuant to the contract, in excess of one-half of the expense of the highway crossing are unconstitutional; (6) whether payments made by the defendant city to build the highway and bridge are expenditures of public funds in aid of a private industry; (7) whether the defendant city may make any expenditure in furtherance of the road and bridge unless and until approval of the planning commission of the city of Norwalk is obtained.

has assigned error in the finding, both as to the facts included by the trial court and as to its refusal to incorporate thirty-five paragraphs of the draft finding. We will summarize the facts actually found by the trial court, with such material corrections in them as the plaintiff is entitled to. We will then consider the additions to the finding which the plaintiff claims should have been made.

There is, in the part of the city known as East Norwalk, a tract of land of some eighty acres, hereinafter referred to as the Devine tract. It is bounded on the north by the Connecticut Turnpike, on the east by the Westport-Norwalk town line, on the south by the main-line right of way of the railroad, and on the west by privately owned property. Prior to 1959, it was zoned for residential use. Sometime before January 8, 1959, the Connecticut state development commission brought the Devine tract to the attention of the Norden Division of the United Aircraft Corporation, hereinafter referred to as Norden, as a possible site for a new plant. Between January 8 and April 23, 1959, the corporation entered into seven option agreements for the purchase of the parcels contained in the tract. The corporation proposed to use this land for research, development and light manufacturing by Norden. Such a use required a change of zone. Norden officials discussed the matter with several persons in the city, including the mayor, the planning officer and representatives of the planning and zoning commissions. At that time, the Devine tract was virtually landlocked and for the most part undeveloped. An estimate that Norden would employ 1500 persons at the new plant was made to the mayor in April, 1959. The capacity of the plant subsequently built was 2500 employees. In April,

1959, the zoning commission rezoned the Devine tract to allow the use of its westerly portion for research and development and the remainder for light industrial purposes.

The Norwalk planning commission, at its meeting on May 6, 1959, considered a proposed layout of new roads for the area. The plan dealt primarily with two existing streets, Triangle Street, which was south of the railroad right of way, and Helen Street, which was northwest of the Devine tract. They were to be improved and connected by a bridge over the railroad and an extension through the westerly portion of the Devine tract. Thus, a direct route would be provided for traffic from Strawberry Hill Avenue, a major north-south artery intersecting Helen Street, southeasterly across the Devine tract and over the bridge to main arteries south of the railroad. This layout would create a new, continuous highway link between highways north of and south of the railroad. We will refer to it as the Triangle Street project. The only public highway which actually entered the Devine tract was Woodside Avenue, a single-lane road which ran along the northerly side of the railroad right of way. The only approach to Woodside Avenue from the south side of the railroad was over a narrow bridge which crossed the railroad some distance west of Triangle Street. Building the Triangle Street bridge would necessitate the relocation of wires carrying the electricity used to operate the railroad. At the meeting of May 6, 1959, the planning commission gave preliminary approval to the Triangle Street project, subject to the following conditions: (1) The city was to undertake a professional traffic study of the area in and around the Devine tract. (2) The aircraft corpora-

tion was to post a surety bond to reimburse the city if the corporation did not build the proposed plant within two years. (3) The road to be built, including the portion to be constructed by the corporation, was to be a public road. (4) Approximately six acres in the westerly end of the Devine tract were to be dedicated for a park area.

At a public hearing and meeting on May 19, 1959, the common council of the city adopted a resolution stating that public convenience and necessity required the alteration, enlargement and improvement of Triangle Street, the extension of Triangle Street across the railroad tracks, and the improvement and extension of Helen Street. The council heard testimony concerning two separate studies of traffic conditions in East Norwalk, one made by the public works commissioner of the city and the other by a firm of traffic consultants which had been employed by the city in 1956. These studies, and later studies made in 1960, showed that there was traffic congestion in East Norwalk prior to the inception of the Norden project, particularly where East Avenue, the main north-south highway, was intersected by highways from the east, including the Connecticut Turnpike. The Triangle Street project would furnish a diagonal road by which some of these intersections could be bypassed, thereby relieving traffic on East Avenue. The project would also give access to the Devine tract. The development of this tract would, however, increase traffic in the area. On May 20, 1959, the city, pursuant to the May 19 resolution of the council, petitioned the public utilities commission for permission to build the proposed Triangle Street bridge over the right of way of the railroad. See General Statutes §§ 16-98, 16-99. After a public hearing, the com-

mission, in an order dated September 14, 1960, found that the proposed bridge was necessary and approved the petition and the plans for the bridge. On September 22, 1959, at a public meeting, the common council adopted another resolution declaring that public convenience and necessity required that the Triangle Street project be carried out.

Previously, on May 21, 1959, the firm of traffic consultants had submitted the first volume of its report on traffic conditions. This volume discussed the heavy traffic on East Avenue and other north-south routes in the city. On May 15, 1960, the firm submitted the second volume of its study, containing recommendations for the improvement of the East Norwalk arterial highway system. The proposed Triangle Street project was recommended for construction during the 1965-70 period. It had, however, been stated by a representative of the firm at the meeting on May 19, 1959, that there was no existing street to take the flow of traffic which could be expected from the construction of Norden.

At a special meeting of the council on August 23, 1960, the mayor was authorized to execute, on behalf of the city, a contract between the city, the corporation and the railroad. Before the council took this action, one of its members, reporting for the finance and public works committees, stated that both committees had reviewed the situation thoroughly and that the reason for entering into the contract was the traffic problem in East Norwalk. On August 29, 1960, the contract was executed by the three parties. It contained the following material provisions: The city agreed to construct a bridge, as approved by the public utilities commission, over the tracks and right of way of the

railroad as an extension of Triangle Street northerly; to pay one-half of the $160,000 estimated cost of the bridge; to pay the cost, estimated at about $90,000, of the temporary and permanent changes in communications, signal and electric transmission facilities necessitated by the construction of the bridge; to pay the railroad $1000 for an easement to cross its right of way; and to maintain the bridge or any replacement of it in the future. The railroad agreed to contribute $25,000 towards the cost of constructing the bridge and to grant an easement to the city across its right of way. The corporation agreed to contribute the difference between $25,000 and one-half of the cost of the bridge.

In September and October, 1959, the corporation exercised its options and took title to the Devine tract. By December, 1959, it had begun construction of its proposed plant, which at the date of the trial was complete and in operation. The cost of constructing the plant was in excess of $6,000,000 and the cost of acquiring the necessary property was in excess of $900,000. The corporation, at a cost of $65,000, built the portion of the Triangle Street extension which passes through the westerly part of the Devine tract. It is a four-lane road which complies with the city's highway specifications. The corporation paid approximately $127,000 for the land for the roadway and an adjacent strip of parkland, all of which is now open to the public and will be dedicated to the public on the completion of the bridge and the connecting road. Construction of the bridge and the city's portion of the road has not yet begun. Up to the time of trial, the city had not disbursed any funds to pay for the construction or maintenance of the Triangle Street project. The railroad trains are operated

by electricity by means of an overhead transmission system. Before the bridge can be built across the railroad, towers carrying the electric transmission and communications lines must be raised and changes made, at a cost of more than $90,000.

The plaintiff assigned error in the refusal of the trial court to include in the finding thirty-five paragraphs of his draft finding. An examination of these proposed findings shows that the additions to which the plaintiff is entitled at best indicate that the Triangle Street project was designed primarily to meet traffic conditions arising because of the proposed use of the undeveloped and virtually landlocked Devine tract.

The plaintiff's appeal raises essentially two basic issues. We will consider first his claim that the city's decision to extend Triangle Street across the railroad right of way, making a bridge necessary, was invalid for lack of the requisite public convenience and necessity. The power of the city to lay out or extend any highway within its territorial limits is defined and governed by its charter. Norwalk Charter §§ 423-25 (1956); 16 Spec. Laws 1073, §§ 113-15, as amended by 17 Spec. Laws 490, § 7. Under these provisions, whether public convenience and necessity warrant the city's laying out or extending a highway in any particular case is essentially a legislative question to be decided by the common council. Unlike the comparable provisions of General Statutes §§ 13-22—13-24, relating to the layout of highways by towns, the Norwalk charter does not provide for a judicial review of the determination of public convenience and necessity. Compare General Statutes §§ 13-22 and 13-23 with § 425 of the Norwalk Charter (1956) (16 Spec. Laws 1075, § 115); see *Miller* v. *Colonial Forestry*

*Co.,* 73 Conn. 500, 505, 48 A. 98. Nevertheless, the council's determination that public convenience and necessity warranted the Triangle Street project is, like any legislative determination to undertake a public work where the question of public convenience and necessity is involved, subject to judicial review on the issue whether the project was designed to serve a legitimate public purpose. *Barnes* v. *New Haven,* 140 Conn. 8, 13, 98 A.2d 523. The thrust of the plaintiff's argument is that the project was designed to serve a private rather than a public use. Public use is equivalent to public convenience and necessity. *Olmstead* v. *Camp,* 33 Conn. 532, 550; see *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 141, 104 A.2d 365. It means public usefulness, utility or advantage, or what is productive of the public benefit. *Gohld Realty Co.* v. *Hartford,* supra; *Water Commissioners* v. *Manchester,* 87 Conn. 193, 204, 87 A. 870. The council's decision was, in effect, that the Triangle Street project would serve a public use or purpose. This was a factual decision. *In re Application of Shelton Street Ry. Co.,* 69 Conn. 626, 630, 38 A. 362. The court reviews it only to ascertain whether it was made in bad faith, in clear abuse of power or in plain disregard of duty. *Baker* v. *Kerrigan,* 149 Conn. 596, 601, 183 A.2d 268; *Graham* v. *Houlihan,* 147 Conn. 321, 328, 160 A.2d 745, cert. denied, 364 U.S. 833, 81 S. Ct. 70, 5 L. Ed. 2d 57; *Bahr Corporation* v. *O'Brion,* 146 Conn. 237, 250, 149 A.2d 691; *Gohld Realty Co.* v. *Hartford,* supra, 146.

There is nothing to indicate that the public officials of the city acted in bad faith or otherwise than in the honest belief that their action to make the Devine tract more usable was in the best interests of the city. See *Kutcher* v. *Town Planning Com-*

*mission,* 138 Conn. 705, 710, 88 A.2d 538. No claim is pressed that there was any technical illegality in the proceedings which might have vitiated them. It is a matter of whether the council acted in abuse of its powers. The actual purchase of the Devine tract by the corporation for Norden may not have been consummated in May, 1959, when the council inaugurated the Triangle Street project, but the construction of the plant was at least imminent and reasonably certain to take place. In fact, as early as April 30, 1959, the corporation had, in writing, committed itself to the construction. The corporation was actually in the process of taking up its options and arranging to close title when the council, on September 22, 1959, acted again to determine the need for the Triangle Street project. Construction of the Norden plant began in December, 1959, but it was not until August 23, 1960, that the council authorized the mayor to enter into the contract with the corporation and the railroad for the construction of the bridge. The city's action appears to have been taken after careful deliberation.

It is true that the city officials, when the possibility of the use of the Devine tract was presented to them, became interested and acted to further the project. But in this day of keen competition to attract industry and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs. See *Norwalk* v. *Connecticut Co.,* 89 Conn. 537, 547, 94 A. 988; *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 214, 83 A.2d 177; *Coppola* v. *New York, N.H. & H.R. Co.,* 143 Conn. 109, 112, 119 A.2d 730. Making this tract usable for a plant which would em-

ploy, it was then estimated, 1500 people and add very substantially to the tax revenues of the city certainly would confer a public benefit. The action taken by the city is closely akin in spirit to the exercise of broad powers by local communities to acquire private property and to expend public funds for urban redevelopment. Cf. *Graham* v. *Houlihan,* supra; *Gohld Realty Co.* v. *Hartford,* supra. That some persons may derive a private advantage cannot defeat the public purpose of such an enterprise. *Berman* v. *Parker,* 348 U.S. 26, 33, 75 S. Ct. 98, 99 L. Ed. 27; *Barnes* v. *New Haven,* 140 Conn. 8, 14, 98 A.2d 523; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 106, 90 A.2d 862; *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702. As part of a coordinated program to make this virtually landlocked and largely undeveloped land a productive part of the community, the city could properly provide for the traffic needs reasonably to be expected.

There were considerations apart from the Norden development of the Devine tract which could reasonably have entered into the council's determination. In 1956, the city had retained a firm of traffic consultants to study traffic conditions. In May, 1959, the firm had reported that the north-south routes in Norwalk were already operating beyond their practical capacities and that immediate, as well as long range, improvements were required. The public works commissioner also had undertaken a study of traffic conditions, and it indicated congestion on East Avenue, a main north-south highway in East Norwalk. The Triangle Street project, running from the northwest to the southeast, would act as a diagonal bypass of the congested intersections on East Avenue. Eighty

acres of vacant land within the limits of a populous city could not be expected to lie fallow indefinitely. If the Devine tract was to be developed for any purpose, industrial or residential, better means of ingress and egress were required. Traffic generally could be expected to increase in the area. When the considerations entering into the decision of a local authority are fairly debatable, courts cannot substitute their judgment of local needs for that of the local authority. *Baker* v. *Kerrigan,* 149 Conn. 596, 601, 183 A.2d 268; *DeMeo* v. *Zoning Commission,* 148 Conn. 68, 75, 167 A.2d 454; *Graham* v. *Houlihan,* 147 Conn. 321, 329, 160 A.2d 745, cert. denied, 364 U.S. 833, 81 S. Ct. 70, 5 L. Ed. 2d 57; *Wade* v. *Town Plan & Zoning Commission,* 145 Conn. 592, 595, 145 A.2d 597; *Clark* v. *Town Council,* 145 Conn. 476, 488, 144 A.2d 327; *Kutcher* v. *Town Planning Commission,* 138 Conn. 705, 709, 88 A.2d 538.

The cost of a highway layout and of highway alteration is a factor in ascertaining whether public convenience and necessity require the work. *In re Application of Shelton Street Ry. Co.,* 69 Conn. 626, 631, 38 A. 362. Although the contract called for an expenditure of approximately $171,000 by the city, it also contemplated a substantial expenditure by the corporation in providing not only the land for the highway within the Devine tract but the adjacent strip of parkland, and in constructing the highway. The expenditure was of real benefit to the city in the development of the tract. The corporation has actually spent $192,000 for these purposes. The trial court did not err in rendering judgment which in effect sustained the determination of the common council that public convenience and necessity required the Triangle Street project.

The plaintiff's other basic claim is that the

promise of the city to pay the entire $90,000 cost of relocating the railroad's communications, signal and electric transmission lines, in addition to paying one-half of the cost of constructing the bridge, exceeds the city's obligation under General Statutes § 16-98 to pay one-half of the expense of extending Triangle Street over the railroad and is an assumption by the city of a portion of the railroad's correlative obligation to pay one-half "the expense of such crossing." Section 16-98 of the General Statutes provides that a new highway across a railroad shall pass over or under the railroad as the public utilities commission directs, and that "[o]ne-half the expense of such crossing" shall be borne by the railroad company and one-half by the municipality constructing the highway.[3] The plaintiff argues that the city's assumption of the railroad's statutory obligation constitutes a municipal donation to a railroad corporation in violation of article tenth, § 3, of the Connecticut constitution. Conversely, the defendants claim, and the trial court found, that the expense of relocating the transmission lines was not an "expense of such crossing" within the meaning of the statute but consequential damages resulting from the city's taking of an easement over the tracks, that is, damages for which the city would have been liable to the railroad company under the principles of eminent domain. The

---

[3] "Sec. 16-98. NEW HIGHWAY ACROSS RAILROAD; EXPENSE. When a new highway is constructed across a railroad, such highway shall pass over or under the railroad as the commission directs. The company operating such railroad shall construct such crossing to the approval of the commission and may take land for the purposes of this section in the manner provided by section 16-86. One-half the expense of such crossing shall be borne by the company constructing the same, and one-half thereof shall be paid to such company by the town, city or borough which is constructing such highway."

question, then, is whether this $90,000 cost is part of what the statute contemplates as "the expense of such crossing."

The state, as a matter of police regulation, can constitutionally require a railroad to pay the entire cost of a railroad bridge over an existing highway. *New York & N.E.R. Co.* v. *Waterbury,* 60 Conn. 1, 9, 22 A. 439; *New York & N.E.R. Co.'s Appeal,* 58 Conn. 532, 541, 20 A. 670. Under the federal constitution, the entire cost of structural changes made necessary by the layout of a new highway across a railroad can be imposed on the railroad. See *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis,* 232 U.S. 430, 441, 34 S. Ct. 400, 58 L. Ed. 671; *Cincinnati, I. & W. Ry. Co.* v. *Connersville,* 218 U.S. 336, 343, 31 S. Ct. 93, 54 L. Ed. 1060; 4 Nichols, Eminent Domain (3d Ed.) § 15.31[2]. That the legislature can apportion the cost of a crossing when a new highway is laid out across a railroad cannot be successfully challenged. *New York & N.E.R. Co.* v. *Waterbury,* supra, 10. Section 16-98 is essentially a police regulation. It does not deal with the matter of just compensation for the acquisition of the easement but rather with an apportionment of "the expense of such crossing." The defendants rely on *New York, N.H. & H.R. Co.* v. *New Haven,* 81 Conn. 581, 71 A. 780. That case is clearly distinguishable from the case at bar. The damages allowed by the court were to compensate the railroad for the cost of building, on its own land, a retaining wall next to a new highway. The wall was needed to support a sidetrack used for switching and as a spur to connect the main line with a nearby manufacturing plant. This sidetrack was not involved in the bridging of the new highway by the main line, and the wall was not located at the crossing. The rail-

road could be operated through the crossing irrespective of the sidetrack and the retaining wall. In the case at bar, the transmission lines are an integral part of the crossing. The railroad cannot be operated through the crossing without them. They are as necessary to the running of the railroad under the bridge as the tracks on which the locomotives and cars roll.

Under the contract, the city assumed one-half the cost of the bridge. The use in § 16-98 of the phrase "expense of such crossing," not "expense of the bridge," is significant. The statute requires that the highway pass over or under the railroad. Patently, the crossing required a bridge in any event. The purpose of the statute is to require a safe and usable crossing for both the highway and the railroad. To accomplish this, not just the building of the bridge but also the relocation of the transmission lines was necessary. Obviously, the legislature, by the phrase "expense of such crossing," instead of "expense of the bridge," intended to include in the cost whatever was essential to fulfil the purpose of the statute. See *Phillips* v. *East Haven*, 44 Conn. 25, 31; *New Haven* v. *New York & N.H.R. Co.*, 39 Conn. 128, 132. The city could not contract contrary to the statute. *Shelton* v. *City of Shelton*, 111 Conn. 433, 439, 150 A. 811. We conclude that the cost of relocating the transmission lines was a part of the "expense of such crossing" under § 16-98. The trial court erred in ruling that the city could assume the entire cost, estimated at $90,000, of relocating the transmission lines.

The city and the corporation filed an assignment of errors. Practice Book § 393. They claimed an error in the finding. The court corrected the finding to include the specific fact which they claimed.

The other errors assigned pertained to the court's ruling that the provision of the contract which would have required the city to maintain the bridge or any replacement of it was invalid. To present this claimed error properly, the defendants should have filed a cross appeal. Practice Book § 383; Maltbie, Conn. App. Proc. §§ 122, 287, 290. The issue, however, involves the public interest, and we will consider it. It is true that the city has not yet been called on to expend any public funds for the maintenance of the bridge. Nevertheless, the contractual obligation to do so in the future is there now, even if some unforeseen event may alter or eliminate it. The plaintiff is entitled to a determination of the issue. *Larkin* v. *Bontatibus,* 145 Conn. 570, 575, 145 A.2d 133; *Hill* v. *Wright,* 128 Conn. 12, 19, 20 A.2d 388. Section 16-111 of the General Statutes requires the railroad to keep in repair all structures over or under its tracks at any highway crossing. *Middletown* v. *New York, N.H. & H.R. Co.,* 62 Conn. 492, 495, 27 A. 119. This legislation has fixed the policy of our state, and the city cannot by action of its common council proceed contrary to the statute. *Old Colony Gardens, Inc.* v. *Stamford,* 147 Conn. 60, 64, 156 A.2d 515; 5 McQuillin, Municipal Corporations (3d Ed.) § 15.21. The trial court's ruling on this feature of the case was correct.

The plaintiff has assigned error in the court's conclusion that he failed to sustain the burden of proving that the Triangle Street project was not duly approved by the planning commission, and that the question whether approval by the planning commission was necessary was not a proper question for a declaratory judgment. These assignments were not pursued in the plaintiff's brief and therefore are considered as having been abandoned.

*Salgreen Realty Co.* v. *Ives,* 149 Conn. 208, 211, 177 A.2d 673.

There is error in part, the judgment is set aside and the case is remanded with direction to render judgment as on file except that subdivision (a) of that judgment should read as follows: "(a) The contract referred to in the first prayer for relief is not illegal and void except for the maintenance provision therein and the provision which requires the city to pay more than one-half of the cost of relocating the railroad transmission lines."

In this opinion the other judges concurred.